# EXHIBIT D

**FIRST AMENDMENT TO LOAN AGREEMENT AND OTHER LOAN DOCUMENTS**

THE FIRST AMENDMENT TO LOAN AGREEMENT (this "First Amendment") is entered into as of May 3, 2024 (the "First Amendment Effective Date"), by and between HARRISBURG HOTELS LLC, a Delaware limited liability company ("Borrower"), DAVID FRANKEL and CHESKY FRANKEL (collectively, the "Guarantor"), and GGP HOTEL HARRISBURG FUNDER LLC, a Delaware limited liability company (together with its successors and assigns, the "Lender").  Lender, Borrower and Guarantor are sometimes hereinafter collectively referred to as the "**Parties**" or individually as a "**Party**."

RECITALS

WHEREAS, Borrower entered into that certain Loan Agreement with Lender dated as of October 5, 2021 (the "Loan Agreement"), pursuant to which Lender made a loan to Borrower and Borrower accepted a loan from Lender in the original principal amount of up to Twenty-Three Million and No/100 Dollars ($23,000,000.00) (the "Loan") and secured by, among other things, property located at 4650 Lindle Road, Harrisburg, PA 17111, on all of the terms and conditions set forth therein.

WHEREAS, Borrower and Lender wish to modify certain terms in the Loan Agreement and other Loan Documents on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and borrower hereto agree as follows:

1. Definitions.  Capitalized terms not otherwise expressly defined herein shall have the meanings ascribed to them in the Loan Agreement.  The Parties hereby agree that the recitals set forth hereinabove are true and correct and incorporated into this First Amendment.

2. Modification to Definitions. The following definitions are hereby modified in Section 1.1 of the Loan Agreement.

   a. The definition of "Permitted Indebtedness" in Section 1.1 of the Loan Agreement is deleted in its entirety and substituted with the following: ***Permitted Indebtedness***: (i) the Debt and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not to exceed $400,000; provided that any Indebtedness incurred pursuant to subclause (i) and (ii) shall be (A) not more than ninety (90) days past due and (B) incurred in the ordinary course of business.

   b. The definition of "Stated Maturity Date" in Section 1.1 of the Loan Agreement shall be deleted in its entirety and substituted with the following: ***Stated Maturity Date***: October 9, 2024, as the same may be extended pursuant to Section 2.9.

3. Definitions. The following definitions are hereby added to Section 1.1 of the Loan Agreement.

   a. ***Carry Costs***: Taxes and Other Charges, insurance costs, Insurance Premiums, unsecured trade payables and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and any other costs reasonably necessary to own, maintain and operate the Property as determined by Lender in its reasonable discretion.

4. <u>Aged Payables</u>. Borrower and Guarantor certify that the Aging Report dated as of February 29, 2024 and attached hereto as Schedule 1 is true and correct. On or before the First Amendment Effective Date, Borrower shall repay the aged payables on the Aging Report such that (A) after such payment, the aged payables conform with the definition of Permitted Indebtedness, and (B) all amounts owed to Marriott International Inc. sixty (60) days or older have been paid. Borrower shall deliver written confirmation to Lender that such payments have been made.

5. <u>Carry Guaranty</u>.

   a. The undefined term "Carry Costs" set forth in Section 1(b) of the Carry Guaranty shall mean the Carry Costs, as defined in the Loan Agreement.

6. <u>Interest Rate Protection</u>. Notwithstanding the provisions of <u>Section 2.7.1(a)</u> of the Loan Agreement, Lender agrees that Borrower may elect, at Borrower's option, not to extend the term of the existing Interest Rate Protection Agreement or enter into a new interest rate protection agreement, in either instance on or prior to the expiration of the existing Interest Rate Protection Agreement. All obligations and provisions in the Loan Agreement with respect to any extension, substitution or new interest rate protection agreement shall be applicable only if Borrower elects to obtain and enter into such extension, substitution or new interest rate protection agreement. Failure of Borrower to obtain a new or replacement Interest Rate Protection Agreement through the Maturity Date and any extension thereto shall not constitute a default under the Loan Agreement.

7. <u>Debt Service Reserve.</u>

   a. On or prior to the date hereof, Borrower shall deposit $900,000.00 into the Debt Service Subaccount to be held and applied in accordance with <u>Section 3.11</u> of the Loan Agreement, which amount shall include all Excess Cash Flow held by Lender, which shall be deposited into the Debt Service Subaccount on the date hereof. provided that in the event the funds deposited into the Deposit Account are below $500,000, Borrower shall be obligated within ten (10) days of notice from Lender to replenish such Interest Reserve Account to an amount equal to $500,000.00.

   b. On or prior to the date hereof, Lender shall transfer, on a one-time basis, all Excess Cash Flow in an amount not less than $184,000.00 currently in the Cash Collateral Reserve into the Debt Service Subaccount to be held and applied in accordance with <u>Section 3.11</u> of the Loan Agreement.

   c. From and after the date hereof up until the Maturity Date, all Excess Cash Flow shall be deposited by Lender directly into the Debt Service Subaccount to be held and applied in accordance with <u>Section 3.11</u> of the Loan Agreement.

   d. For purposes of clarity, any reference in the Loan Documents to a Debt Service Reserve shall mean the Debt Service Subaccount.

8. <u>PIP GC Reserve</u>.

   a. On or prior to the date hereof, Lender shall fund $750,000 from the Future Funding Amount into a PIP GC Reserve Subaccount (the "**PIP GC Advances**") for the sole purpose of making payments to Crystal Hospitality (the "**General Contractor**") for work performed under either of the two (2) contracts between Borrower and General Contractor for

2

    renovation of the Property. A portion of PIP GC Advances shall be funded to Borrower or directly to Crystal Hospitality within three (3) Business Days after delivery by Borrower to Lender a request for payment of such funds and delivery of the required documents as set forth in Section 3.12.2(a). Subsequent to funding any PIP GC Advances to Borrower or the General Contractor, as the case may be, Lender shall replenish the PIP GC Reserve Subaccount for the amounts funded. PIP GC Advances shall be advances on the Loan and shall accrue interest as of the date such amounts are funded by Lender into the PIP GC Reserve subaccount. PIP GC Advances shall never exceed the remaining Future Funding Amount or the total amount of the Loan.

    b. PIP Draw 10 was submitted to Lender in the total amount of $1,863,154.33 ("**Draw 10**"). Within five (5) business days of the First Amendment Effective Date, Lender shall wire to Crystal Hospitality all amounts due and payable to Crystal Hospitality LLC as part of PIP Draw 10 submitted by Sponsor, which amount totals $750,223.52 (the "Crystal Draw 10 Payment"), along with the remaining portion of Draw 10. The Crystal Draw 10 Payment shall be separate and apart from Lender's obligation to fund the PIP GC Advances.

9. PIP Shortfall.

    a. Section 3.12 of the Loan Agreement is hereby modified by adding the following to the end of Section 3.12.1: At any time and from time to time during the term of the Loan, in connection with the Required Capital Improvements, if Lender determines in its reasonable discretion, that the costs and expenses of such Required Capital Improvements exceeds the sum of the projected cost for such Required Capital Improvements reflected on the Approved Capital Expenditures (the "PIP Shortfall"), Lender shall have the right to notify Borrower in writing (the "PIP Shortfall Notice") that such PIP Shortfall exists. If Lender at any time shall deliver a PIP Shortfall Notice to Borrower, Borrower shall within fifteen (15) Business Days of delivery of the PIP Shortfall Notice, deposit into an account with Lender (the "Rebalancing Reserve Account") an amount equal to such PIP Shortfall. Lender shall have no obligation to make further Future Funding (i) at any time a PIP Shortfall exists and (ii) until the sums required to be deposited in the Rebalancing Reserve Account pursuant to this Section have been exhausted and, in any such case, the Loan is back "in balance." Any such sums not used as provided shall be released to Borrower when and to the extent that Lender determines that a PIP Shortfall does not exist, provided, however, that should an Event of Default occur, Lender, in its sole discretion, may apply such amounts either to the remaining costs and expenses to complete the PIP Work or to the immediate payment of any Obligations of Borrower.

    b. Section 1(b) of the Completion Guaranty is hereby amended by inserting after the last sentence the following text: "including, but not limited to, the payment of any amount required to be funded by Borrower to the Rebalancing Reserve Account in accordance with the Loan Agreement regardless of whether construction has commenced, the Maturity Date has occurred or there has been an acceleration of the Loan) and payment of any PIP Shortfall amount due and payable under the Loan Agreement (regardless of whether construction has commenced, the Maturity Date has occurred or there has been an acceleration of the Loan), and, for the avoidance of doubt, Lender shall not be required to demonstrate a loss or other impairment under the Loan in order to enforce the obligation in this clause."

10. <u>Representations and Warranties</u>.  Each of Borrower and Guarantor hereby represent and warrant to Lender, as of the date hereof, as follows:

   a. Such party has, to the extent applicable, the power and requisite authority to execute, deliver and perform its obligations under this First Amendment and, to the extent applicable, is duly authorized to, and has taken all action necessary to authorize such party to, execute, deliver and perform its obligations under this First Amendment.

   b. This First Amendment constitutes a legal, valid and binding obligation of such party (as applicable), enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the rights of creditors generally, and by general principles of equity.

   c. No consent, approval, authorization, or order of any court, Governmental Authority, or any other third party is required in connection with the execution and delivery by such party of this First Amendment or to consummate the transactions contemplated hereby, which consent has not been obtained.

   d. The representations and warranties made by Borrower in the Loan Agreement and the representations and warranties made by Borrower and Guarantor in the other Loan Documents to which each such Person is a party are true and correct in all material respects as if remade on the date hereof except for (a) representations expressly made solely as of a prior date, or (b) representations or warranties which are no longer true and correct due to any changes of facts or circumstances which do not constitute a Default or Event of Default and disclosed to Lender in writing prior to the date hereof.

   e. No Default or Event of Default is continuing.

11. <u>Reaffirmation</u>.  Borrower and Guarantor each have had the opportunity to review this First Amendment and are entering into this First Amendment with full knowledge of the terms of this First Amendment.  Guarantor hereby agrees and acknowledges that the Completion Guaranty, the Carry Guaranty, the Recourse Guaranty and the Environmental Indemnity (as used herein, and each as amended by this First Amendment, collectively, the "<u>Guaranties</u>") are and shall remain in full force and effect and are valid, binding, and enforceable against the applicable Guarantor upon the terms and conditions set forth therein, as amended hereby, subject to applicable bankruptcy, insolvency and similar laws affecting the rights of creditors generally, and general principles of equity, and Guarantor's obligations and liabilities under the Guaranties shall continue without impairment or limitation by reason of this First Amendment.  Guarantor further reaffirms its obligations under the Guaranties as separate and distinct from Borrower's obligations under the Loan Documents.  The Loan Documents to which Borrower is a party, as amended hereby, are valid, binding and enforceable against Borrower, as applicable, upon the terms and conditions set forth therein, as amended hereby, subject to applicable bankruptcy, insolvency and similar laws affecting the rights of creditors generally, and Borrower's obligations and liabilities under such agreements, as amended hereby, shall continue without impairment or limitation by reason of this First Amendment.  Borrower hereby reaffirms the Loan Documents to which it is a party, and its liabilities, waivers, agreements, covenants and obligations under such Loan Documents, as applicable.

12. <u>Costs and Expenses</u>. Borrower shall pay all costs and expenses of Lender in connection with the negotiation of this First Amendment, including, without limitation, all reasonable fees and expenses

4

of Lender's counsel. In addition, Borrower shall pay to Lender a modification fee equal to $75,000. The payment of the fee, which is required for the execution of this First Amendment to Loan Agreement, is due and payable on or prior to the execution date hereof.

13. <u>Lender Release</u>. Subject to the last sentence of this Section 13, each of Borrower and Guarantor hereby acknowledge and agree that, as of the date hereof, neither Borrower nor Guarantor has any claims, counterclaims, damages, actions, suits, causes of action, rights, liens, demands, obligations, claims for attorneys' fees, and/or liabilities, offsets, or defenses (collectively, "<u>Claims</u>") against Lender or any of its past and present employees, agents, representatives, attorneys, accountants, auditors, insurers, officers, directors, managers, parents, subsidiaries, affiliates, divisions, predecessors, reinsurers, successors, heirs, and assigns (together with Lender, collectively, "<u>Lender Persons</u>"), in each instance, in connection with the Loan, including any existing liability for the performance or alleged non-performance of any of Lender's obligations under the Loan Documents. For the avoidance of doubt, if Borrower or Guarantor now has, or ever did have, any Claims against any Lender Persons in connection with the Loan, at law or in equity, through the date hereof, each of Borrower and Guarantor expressly WAIVE, and expressly RELEASE, all Lender Persons from any liability in connection with any such Claims. This release of Lender Persons shall constitute a complete defense to any Claim released pursuant to this <u>Section</u>. Notwithstanding the foregoing, if at any time Lender shall fail to fund any PIP GC Advance or release funds from the PIP Reserve Funds to Borrower or Crystal Hospitality, as the case may be, on or before the last day of the Funding Period (described below), which Funding Period shall commence on the day after Borrower has submitted (A) an Officer's Certificate from Borrower (1) stating that the items to be funded by the requested disbursement are Required Capital Improvements, and a description thereof, (2) stating that all Approved Capital Expenditures to be funded by the requested disbursement have been completed (or completed to the extent of the requested disbursement) in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (3) identifying each Person that supplied materials or labor in connection with the Required Capital Improvements to be funded by the requested disbursement, (4) stating that each such Person has been paid in full or will be paid in full upon such disbursement, or if such payment is a progress payment, that such payment represents full payment to such Person, less any applicable retention amount, for work completed through the date of the relevant invoice from such Person, (5) stating that the Required Capital Improvements (or the relevant portions thereof) to be funded from the disbursement in question have not been the subject of a previous disbursement, (6) stating that all previous disbursements of PIP Funds have been used to pay the previously identified Required Capital Improvements, and (7) stating that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full other than any applicable retention amount, or as may be permitted hereunder, (B) a copy of any license, permit or other approval required by any Governmental Authority in connection with the Required Capital Improvements and not previously delivered to Lender, (C) copies of appropriate lien waivers, conditional lien waivers, or other evidence of payment satisfactory to Lender, (D) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (E) such other reasonable evidence to demonstrate that the Required Capital Improvements to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Borrower), this waiver and release shall be null and void as if this waiver and release was never delivered. Commencing on the first (1st) business day after receipt of items (A) through (D) above (the "<u>PIP Submission Package</u>"), Lender shall have seven (7) business days in the aggregate to review the PIP Submission Package (the "<u>Review Period</u>"). By the end of the third (3rd) business day of the

5

Review Period, Lender shall submit to Borrower any questions about the PIP Submission Package, and Borrower shall respond to Lender no later than two (2) business days after receipt of such Lender questions.  Lender shall fund the PIP GC Advance or release funds from the PIP Reserve Funds to Borrower, or such portion of the PIP GC Advance or PIP Reserve Funds that Lender has reasonably approved in accordance with item (E) above, as the case may be, no more than five (5) business days after the last day of the Review Period (the "**Funding Period**").

14. <u>No Course of Conduct, Etc</u>.  Each of Borrower and Guarantor are hereby advised, and each of Borrower and Guarantor hereby acknowledge and agree that this First Amendment does not affect, waive, modify, or amend the Loan Documents in any respect whatsoever except as expressly set forth herein, and in particular, this First Amendment shall not constitute (I) except as expressly set forth herein, a waiver or a modification or amendment of Borrower's or Guarantor's payment or performance obligations set forth in the Loan Documents, (II) except as expressly set forth herein, a cure or waiver of any Defaults or Events of Default under the Loan Documents, (III) a forbearance from or prejudice to Lender's exercise of remedies pursuant to the Loan Documents, at law or in equity, (IV) a waiver of or prejudice to any rights, powers, privileges, or remedies that Lender or Borrower may have under the Loan Documents, at law or in equity, (V) a course of conduct obligating Lender to act in a similar fashion in the future, regardless of the economic status of the Borrower or Guarantor or general economic conditions at such future time, (VI) a failure to act on the part of Lender, or (VII) a rescission or modification of any notices given to Borrower, Guarantor, or any other obligor.  Lender has the right to pursue all such rights and remedies with respect to any Defaults or Events of Default under the Loan Documents and any other existing delinquencies, breaches, Defaults or Events of Default, and with respect to any future delinquencies, breaches, Defaults, or Events of Default, as provided in the Loan Documents.  In addition, and without limitation, Lender's execution of this First Amendment does not and shall not (a) prejudice or preclude any other or further exercise of any right or remedy of Lender or Borrower provided by law or in equity, or (b) entitle Borrower or Guarantor to any other or further notice of demand whatsoever.  The execution and delivery of this First Amendment is not intended to constitute a novation of the Loan Documents nor impair or modify the priority of any security document executed in connection therewith.

15. <u>Ratification</u>.  Borrower and Lender hereby ratify and confirm their respective rights and obligations under the Loan Agreement.  Except as specifically herein amended, the Loan Agreement is and shall remain in full force and effect according to the terms thereof.  In the event of any conflict between the terms and provisions of the Loan Agreement and the terms and provisions of this First Amendment, the terms and provisions of this First Amendment shall control.  Borrower confirms that the PIP is in compliance with all requirements from Marriott International Inc.

16. <u>Headings</u>.  The headings to sections of this First Amendment are for convenient reference only and shall not be used in interpreting this First Amendment. If any provision of this First Amendment or any of the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this First Amendment and the remaining parts shall remain in full force as though the invalid, illegal, or unenforceable portion had never been a part thereof.

17. <u>Authority</u>.  Borrower represents and warrants to the other that the persons executing this First Amendment on behalf of such party have the full right, power and authority to enter into and execute this First Amendment on such party's behalf and that no consent from any other person or entity is necessary as a condition precedent to the legal effect of this First Amendment.

18. <u>Merger; Amendments</u>.  Except as set forth herein, the Loan Agreement remains unmodified and in full force and effect.  In the event of any inconsistency between the provisions of the Loan Agreement and this First Amendment, the terms of this First Amendment shall control. All prior understandings and agreements between the parties with respect to the subject matter of this First Amendment are merged within this First Amendment, which alone fully and completely sets forth the understanding of the parties with respect thereto.  This First Amendment may not be changed or modified nor may any of its provisions be waived orally or in any manner other than by a writing signed by Borrower and Lender.

19. <u>Successors and Assigns</u>.  The terms, covenants and conditions contained herein are binding upon and inure to the benefit of the parties hereto and their successors and assigns and is for the benefit of the Parties and their respective successor and assigns, and not for any other person or entity.

20. <u>Governing Law</u>.  This First Amendment has been executed and delivered in, and shall be interpreted, construed, and enforced pursuant to and in accordance with the laws of the State of New York.  All duties and obligations of the Borrower and Lender created hereunder are performable in New York, which shall be the sole and exclusive venue for any litigation, special proceeding, or other proceeding between the Borrower and Lender that may be brought, arise out of or in connection with or by reason of this First Amendment.

21. <u>Counterparts</u>.  This First Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Any counterpart of this First Amendment may be executed and delivered by electronic transmission (including, without limitation, e-mail or by portable document format (pdf)) and shall have the same force and effect as an original.

[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this First Amendment to be executed this First Amendment on the day and year set forth above.

BORROWER:

HARRISBURG HOTELS LLC,
a Delaware Limited Liability Company

By: _____
    Name: David Frankel
    Title:  Authorized Signatory

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

LENDER:

GGP HOTEL HARRISBURG FUNDER LLC,
a Delaware Limited Liability Company

By: _____
    Name:
    Title:

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

[Signature Page to First Amendment to Senior Loan Agreement]

*ACTIVE 687687738v6*

GUARANTOR:

DAVID FRANKEL

_____

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

[Signature Page to First Amendment to Loan Agreement]

ACTIVE 687687738v6

GUARANTOR:

CHESKY FRANKEL

_____

[Signature Page to First Amendment to Loan Agreement]

ACTIVE 687687738v6